**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| |
|---|
| UNITED STATES OF AMERICA |
| |
| v. |
| |
| MICHAEL COSCIA, |
| Defendant. |

14 CR. 551

Judge Harry D. Leinenweber

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendant Michael Coscia*

December 15, 2014

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ....................................................................................3

I.    Mr. Coscia's Alleged Conduct.................................................................3

II.   The "Anti-Spoofing" Provision ...............................................................5

III.  The "Anti-Spoofing" Provision Has No Settled Meaning.............................6

      A.    CFTC's Proposed Rulemaking ....................................................6

      B.    The CFTC Roundtable and Other Public Commentary ....................7

      C.    CFTC's Proposed Interpretive Order............................................10

      D.    Public Commentary on the Proposed Interpretive Guidance............12

      E.    CFTC's Interpretive Guidance and Policy Statement......................13

ARGUMENT ...................................................................................................14

I.    The Spoofing Charges Must Be Dismissed Because The "Anti-Spoofing"
Provision Is Void for Vagueness. ...........................................................15

      A.    The "Anti-Spoofing" Provision Does Not Provide Fair Notice Of
What Trading Activity Constitutes Spoofing. .................................15

            1.    Governing Legal Standards.................................................15

            2.    Discussion ......................................................................17

      B.    CFTC's Subsequent Interpretive Guidance Does Not Cure The
Vagueness As Applied To Mr. Coscia's Trading Activity. ...............22

            1.    At The Time Of Mr. Coscia's Trading Activity, The Commission Had
Issued Only A Nonbinding Proposed Order That Did Not Even Purport
To Cover His Conduct. ......................................................23

            2.    The Commission's Final Guidance Postdates Mr. Coscia's Trading
Activity And In Any Event Does Not Cover His Conduct.................25

II.   The Commodity Fraud Counts Are Legally Invalid. ...................................26

      A.    The Spoofing Charges Cannot Simply Be Relabeled As Fraud
Charges. ...............................................................................27

      B.    Mr. Coscia Did Not Engage In A Scheme To Defraud As A Matter
of Law. .................................................................................28

C.      Section 1348 Would Be Impermissibly Vague If It Were Interpreted
        To Reach Mr. Coscia's Trading...................................................................32

CONCLUSION..................................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Ass'n* v. *United States*,
    887 F.2d 760 (7th Cir. 1989) .......................................................................... 24

*Ashton* v. *Kentucky*,
    384 U.S. 195 (1966) ...................................................................................... 16

*Chicago* v. *Morales*,
    527 U.S. 41 (1999) ................................................................... 16, 17, 23, 25

*Coates* v. *Cincinnati*,
    402 U.S. 611 (1971) ...................................................................................... 17

*CFTC* v. *Schor*,
    478 U.S. 833 (1986) ...................................................................................... 24

*Frey* v. *CFTC*,
    931 F.2d 1171 (7th Cir. 1991) ...................................................................... 26

*Grayned* v. *City of Rockford*,
    408 U.S. 104 (1972) .................................................................... 9, 15, 16, 20

*Lanzetta* v. *New Jersey*,
    306 U.S. 451 (1939) ...................................................................................... 23

*Neder* v. *United States*,
    527 U.S. 1 (1999) ..................................................................................... 29, 30

*Reynolds* v. *East Dyer Dev. Co.*,
    882 F.2d 1249 (7th Cir. 1989) ...................................................................... 29

*Smith* v. *Goguen*,
    415 U.S. 566 (1974) ................................................................................. 16, 17

*Stoller* v. *CFTC*,
    834 F.2d 262 (2d Cir. 1987) .......................................................................... 21

*United States* v. *Dial*,
    757 F.2d 163 (7th Cir. 1985) ........................................................................ 30

*United States* v. *Finnerty*,
    533 F.3d 143 (2d Cir. 2008) ............................................................... 30, 31, 32

*United States* v. *La Mantia*,
    2 Comm. Fut. L. Rep. (CCH) ¶ 20,667 (N.D. Ill. Aug. 9, 1978) ................ 20, 21

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*United States* v. *Lanier*,
    520 U.S. 259 (1997)...................................................................................23

*United States* v. *LeDonne*,
    21 F.3d 1418 (7th Cir. 1994) ...................................................................28

*United States* v. *Mahaffy*,
    693 F.3d 113 (2d Cir. 2012).......................................................................30

*United States* v. *Nat'l Dairy Prods.*,
    372 U.S. 29 (1963).....................................................................................16

*United States* v. *Novak*,
    No. 13-CR-312, 2014 WL 2937062 (N.D. Ill. June 30, 2014) ........................15

*United States* v. *Radley*,
    632 F.3d 177 (5th Cir. 2011) .......................................................22, 27, 28

*United States* v. *Radley*,
    659 F. Supp. 2d 803 (S.D. Tex. 2009) .......................................................22, 31

*United States* v. *Reese*,
    92 U.S. 214 (1876).....................................................................................16

*United States* v. *Risk*,
    843 F.2d 1059 (7th Cir. 1988) ...................................................................14

*United States* v. *Vest*,
    448 F. Supp. 2d 1002 (S.D. Ill. 2006)........................................................14

*United States* v. *White*,
    610 F.3d 956 (7th Cir. 2010) .....................................................................14

*United States* v. *Yasak*,
    884 F.2d 996 (7th Cir. 1989) .....................................................................14

*Williams* v. *Aztar Ind. Gaming Corp.*,
    351 F.3d 294 (7th Cir. 2003) ...............................................................28, 30

*Williams* v. *United States*,
    458 U.S. 279 (1982)...................................................................................29

*Winters* v. *New York*,
    333 U.S. 507 (1948)...................................................................................15

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

<u>Statutes and Rules</u>

7 U.S.C. § 2(g) ............................................................................................... 28

7 U.S.C. § 6c ............................................................................................... *passim*

7 U.S.C. § 13(a)(2) ........................................................................................... 5

18 U.S.C. § 1344 ............................................................................................ 28

18 U.S.C. § 1348 ................................................................................... 5, 27, 32

156 Cong. Rec. S5922 (2010) ........................................................................ 5

75 Fed. Reg. 67,301 (2010) ................................................................... 6, 7, 23

76 Fed. Reg. 14,826 (2011) ..................................................................... 11, 24

76 Fed. Reg. 14,943 (2011) ................................................... 11, 12, 20, 25

78 Fed. Reg. 31,890 (2013) ................................................... 13, 14, 20, 26

Fed. R. Crim. P. 12 ........................................................................................ 14

<u>Other Authorities</u>

CFTC Q&A — Proposed Interpretive Order on Disruptive Trading Practices,
    available at
    http://www.cftc.gov/LawRegulation/DoddFrankAct/Rulemakings/DF_24_
    DisruptiveTrading/index.htm (last visited Dec. 14, 2014) ................................................. 11

CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) ................. 7, 8, 19, 31

CME Globex Order Qualifiers, available at
    http://www.cmegroup.com/confluence/ (last visited Nov. 6, 2014) ................................. 18

CME Group RA 1405-5 (Aug. 28, 2014) ........................................................... 22

Federal Register, "A Guide To The Rulemaking Process," available at
    https://www.federalregister.gov/learn/tutorials ................................................. 6

CFTC Open Meeting on the Twelfth Series of Proposed Rulemakings Under the
    Dodd-Frank Act  (Feb. 24, 2011) ........................................................... 10, 11, 33

Letter from Craig S. Donohue, Chief Executive Officer of the CME Group (Jan.
    3, 2011) ................................................................................................. 9

Letter from Craig S. Donohue, Chief Executive Officer of the CME Group
    (May 17, 2011) ........................................................................................ 19

Letter from Gary DeWaal, Senior Managing Director of Newedge (Jan. 5,
    2011) ................................................................................................. 9, 10

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Letter from John M. Damgard, President of the  Futures Industry Association (Dec. 23, 2010) ...................................................................................................... 9

Letter from John M. Damgard, President of the Futures Industry Association, and Kenneth E. Bentsen, Jr., Executive Vice President of the Securities Industry and Financial Markets Association (May 17, 2011).................................... 12, 19

Letter from Stuart J. Kaswell, General Counsel of the Managed Funds Association (Dec. 28, 2010)........................................................................................ 9

Letter from Stuart J. Kaswell, General Counsel of the Managed Funds Association (May 16, 2011)...................................................................................... 13, 19

Mary  L. Schapiro, Chairwoman of the SEC, Address at the Economic Club of New York: Strengthening Our Market Equity Structure (Sept. 7, 2010) ........................ 20

OneChicago Rulebook, Rule 404, available at http://www.onechicago.com/?page_id=2697 ................................................... 18

Scott Patterson, *CFTC Targets Rapid Trades*, Wall Street Journal, March 15, 2012, http://www.wsj.com/articles/SB100014240527023038634045772838506 94110794.......................................................................................................................... 20

Merriam-Webster Online, "Spoof," http://www.merriam-webster.com/dictionary/spoof (last visited Dec. 7, 2014) ........................................................................................................................... 21

U.S. Attorney's Office, N. Dist. Ill., Press Release, *High-Frequency Trader Indicted for Manipulating Commodities Futures Markets in First Federal Prosecution for "Spoofing"* (Oct. 2, 2014), *available at* http://www.justice.gov/usao/iln/pr/chicago/2014/pr1002_01.html ..................................... 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA |  |
|  | 14 CR. 551 |
| v. | Judge Harry D. Leinenweber |
| MICHAEL COSCIA, |  |
| Defendant. |  |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

In announcing the charges in this case, the United States Attorney stated, "The indictment marks the first federal prosecution nationwide under the anti-spoofing provision that was added to the Commodity Exchange Act by the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act."[1]   In its zeal to enforce this provision for the very first time, however, the government has overlooked that the "anti-spoofing" provision is hopelessly vague, and its criminal enforcement would violate Michael Coscia's right to due process of law.

For years after the "anti-spoofing" provision was enacted, both leading market participants and government officials themselves repeatedly acknowledged that the statute was vague, and its core term—"spoofing"—had no accepted meaning or understanding in the futures industry.  Because the provision had been inserted into the Dodd-Frank Act without discussion, the Commodity Futures Trading Commission ("CFTC") spent two-and-a-half years attempting to promulgate a rule that would clarify the reach of the provision in some

---

[1]      U.S. Attorney's Office, N. Dist. Ill., Press Release, *High-Frequency Trader Indicted for Manipulating Commodities Futures Markets in First Federal Prosecution for "Spoofing"* (Oct. 2, 2014), *available at* http://www.justice.gov/usao/iln/pr/chicago/2014/pr1002_01.html. (Ex. A).

sensible way.  The CFTC ultimately abandoned its rulemaking effort in the face of overwhelming criticism.  Instead, in May 2013—more than 18 months *after* the events at issue in this case—the CFTC issued "interpretive guidance" that attempted to put contours around what was and what was not unlawful "spoofing."  Notably, at the time of Mr. Coscia's actual conduct, no civil or criminal enforcement proceeding had *ever* been initiated on the basis of the "anti-spoofing" provision.  This history compels the conclusion that the provision is unconstitutionally vague, and the government's effort to hold Mr. Coscia criminally responsible here fails as a matter of law.

Perhaps recognizing that this first effort to enforce the "anti-spoofing" provision is doomed to failure, the government also attempts to recast its "spoofing" allegations as "commodity fraud."  This novel construction also fails.  Because the only "fraud" alleged is the same conduct alleged to constitute "spoofing," the failure of the spoofing charges deprives the fraud charges of substance and also requires their dismissal.  But even setting aside the derivative nature of the fraud charges, Mr. Coscia's trading did not involve "fraud" of any kind as a matter of law.  Indeed, if his trading were swept within the reach of the commodities fraud statute, then the fraud charges would fail for the same reason the spoofing charges do:  vagueness and the consequent lack of any fair notice.

Together, the charged offenses are a glaring example of prosecutorial overreach, as the government attempts to spring after-the-fact criminality on an unsuspecting defendant who could not reasonably have known that his conduct fell within the reach of either an obscure, never-tested statute or the novel construction of another.  No trial is necessary for this Court to conclude that these charges are legally flawed and should be dismissed.

## STATEMENT OF FACTS

### I.  Mr. Coscia's Alleged Conduct

Michael Coscia is a commodities futures trader with over 25 years of experience.  Since 2007, he has been the principal of Panther Energy Trading, a firm that engaged in computer-driven, "algorithmic" trading of futures contracts, including those listed on CME Group exchanges.  Indictment Count One ¶¶ 1(b)-(d), 4.

The Indictment is based upon Mr. Coscia's design and operation between August and October 2011 of algorithmic, high-frequency trading programs through which he allegedly "entered large-volume orders that he intended to immediately cancel before they could be filled by other traders."  *Id.* ¶ 3.  It is alleged that this strategy was devised to "create a false impression regarding the number of contracts available in the market, and to fraudulently induce other market participants to react to the deceptive market information that [the programs] created."  *Id.*

When certain market conditions were present, these programs automatically entered a series of orders on both sides of the market for various futures contracts that were traded on electronic exchanges operated by the CME Group and ICE Futures Europe.  *Id.* ¶¶ 4-6.  On one side of the market, the programs placed a so-called "trade order," typically an order to buy or sell a small number of futures contracts.  Mr. Coscia is alleged to have intended this "trade order" to be filled when other market participants elected to transact at that price. On the other side of the market, the programs sequentially entered so-called "quote orders," a series of two to four larger orders at progressively improving prices.  These orders were allegedly the largest and best-priced orders in the market and often doubled or tripled the total quantity of contracts offered within the prevailing bid-ask spread.  *Id.* ¶¶ 8-9.

The Indictment alleges that Mr. Coscia did not intend for these "quote orders" to be filled, and that he consequently designed the algorithms to automatically cancel them a

-3-

fraction of a second after they were entered (or if any of them were partially filled). *Id.*
¶¶ 10-11. The Indictment further charges that the quote orders were intended to "trick other traders into reacting to the false price and volume information . . . created with the fraudulent and misleading quote orders," and to cause them to agree to fill Mr. Coscia's trade order. *Id.* It is alleged that because the quote orders "appeared to represent a substantial change in the market," the orders were intended to "mislead other traders," causing them "to react" and "move[] the market in a direction favorable to" Mr. Coscia. *Id.* ¶¶ 3, 10.

Once the trade order was filled, the algorithm was programmed to cancel the quote orders and then run in reverse in an effort to sell (or repurchase) the futures contracts purchased (or sold) in the first leg of the transaction, and capture any resulting profit. *Id.* ¶ 12. The Indictment provides six examples of this activity, all of which occurred during September 2011 and netted Mr. Coscia total profits of $1,070. *Id.* ¶¶ 13-15; *see also* Indictment Counts 2-12.

The Indictment includes repeated (but entirely conclusory) allegations that Mr. Coscia's "quote orders" were somehow fraudulent or misleading. Other than alleging that the quote orders were designed to be automatically canceled shortly after being entered or if partially filled—both common features of wholly legitimate trading—the Indictment does not even attempt to explain what made these orders "false," "misleading," or an "illusion." Indictment Count One ¶¶ 3, 9, 10, 11. To the contrary, the Indictment concedes that the orders were available to be filled, and does not allege that Mr. Coscia ever failed to honor them if other market participants acted upon them. *See id.* ¶ 11.

Notably, the Indictment does not allege any misrepresentations to the market participants he is accused of misleading. Instead, it charges without detail that he "did misrepresent, conceal, and hide, and cause to be misrepresented, concealed and hidden, the true acts and the purposes of the acts done in furtherance of the scheme." *Id.* ¶ 14. The absence of

any such detail is no surprise, since Mr. Coscia is not alleged to have had any direct interaction with other market participants whatsoever. All he is alleged to have done is placed orders on an electronic trading platform, where he necessarily interacted anonymously with other users of an electronic marketplace. *Id.* ¶ 1(g).

On the basis of these allegations, the Indictment charges Mr. Coscia with six counts of "spoofing," in violation of 7 U.S.C. § 6c(a)(5)(C), and six counts of commodity fraud, in violation of 18 U.S.C. § 1348.

## II.    The "Anti-Spoofing" Provision

In July 2010, President Obama signed into law the 800-page Dodd-Frank Wall Street Reform and Consumer Protection Act. Section 747 of the Act, which became effective in July 2011 and is codified at 7 U.S.C. § 6c, amended the Commodity Exchange Act ("CEA") to prohibit so-called "disruptive practices," including "any trading, practice, or conduct that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5)(A)-(C). A knowing violation of Section 6c is a felony, punishable by up to 10 years in prison. 7 U.S.C. § 13(a)(2).

The disruptive-practices provision appeared silently during the debates over the Dodd-Frank Act's enactment. The provision has no apparent drafting or legislative history: there are no previous versions, no committee reports, no testimony by any witness during committee proceedings, and no discussion during congressional floor debates. The sole reference to the provision is a single statement from one Senator: "The CFTC requested, and received, enforcement authority with respect to . . . disruptive trading practices." 156 Cong. Rec. S5922 (2010) (Ex. B). Because the disruptive-practices provision simply materialized, with no public discussion, there is literally nothing in the legislative record to illuminate the provision's meaning or reach. The Act nevertheless gave the CFTC—the nation's primary

regulator of futures markets—authority to promulgate regulations to prohibit disruptive trading practices, including "spoofing."  *See* 7 U.S.C. § 6c(a)(6).

## III.    The "Anti-Spoofing" Provision Has No Settled Meaning.

From the passage of the Dodd-Frank Act, all parties involved—the CFTC, futures exchanges, and market participants—recognized that the language of the "anti-spoofing" provision was vague and overbroad.  Indeed, "spoofing" was never part of the CEA or any rule or regulation promulgated under it.  As a result, the CFTC spent two-and-a-half years attempting to narrow and clarify the provision's meaning.  That process culminated in a policy statement that was not issued until May 2013, more than 18 months after Mr. Coscia's trading ended.

### A.    CFTC's Proposed Rulemaking

In November 2010, the CFTC published an Advance Notice of Proposed Rulemaking ("ANPR") inviting comment on various questions related to potentially disruptive trading practices.  *See* 75 Fed. Reg. 67,301 (2010).[2]  In the ANPR, the CFTC acknowledged that the definition of "spoofing" set forth in the statute—*i.e.*, "bidding or offering with the intent to cancel the bid or offer before execution," 7 U.S.C. § 6c(a)(5)(C)—if read literally, would capture routine, lawful market conduct that no one seriously contends could be unlawful.  For that reason, the CFTC asked for comment about how it should distinguish "spoofing" from "legitimate trading activity," such as (a) a partial-fill order "where an individual enters an order larger than necessary with the intention to cancel part of the order to

---

[2]    An ANPR is an agency's "formal invitation to participate in shaping the proposed rule and starts the notice-and-comment process in motion.  Anyone interested (individuals and groups) may respond to the Advance Notice by submitting comments aimed at developing and improving the draft proposal or by recommending against issuing a rule."  Federal Register, "A Guide To The Rulemaking Process," available at https://www.federalregister.gov/learn/tutorials (last visited Dec. 9, 2014) (Ex.O).

ensure that his or her order is filled," or (b) "the submission, modification, and cancelation of orders that may occur in the normal course of business." 75 Fed. Reg. at 67,302.

As especially relevant here, the ANPR identified certain practices—including "[s]ubmitting or cancelling multiple bids or offers to cause a material price movement" or "to create an appearance of market depth that is false"—and asked for comment on whether those practices should "be considered a form of 'spoofing' that is prohibited by [the 'anti-spoofing' provision]" or whether instead those practices should be "*separately specif[ied] and prohibit[ed] . . . as distinct from 'spoofing' as articulated in paragraph (C)*." *Id*. (emphasis added). In other words, the CFTC itself recognized that the Dodd-Frank Act does not indicate by its terms whether "spoofing" encompasses these specific practices, or whether they fall within the ambit of other "disruptive practices" as to which the CFTC was authorized to enact rules.

The CFTC further requested feedback on whether it should promulgate rules governing the "design" and "use" of "algorithmic or automated trading systems to prevent disruptive trading practices." *Id*. "If so," the CFTC inquired, "what kinds of rules should [it] consider?" *Id*. In an accompanying statement, then-CFTC Chairman Gary Gensler said that he was "particularly interested in hearing from the public on algorithmic trading" in their comments and at a roundtable with CFTC staff to be held in December 2010. *Id*. at 67,303.

**B. The CFTC Roundtable and Other Public Commentary**

At the CFTC's December 2010 roundtable, a panel of market professionals made clear that "spoofing" had no accepted meaning in the futures and derivatives markets. Among other comments were the following:

- Gary Dewaal, Newedge USA LLC (one of the world's largest futures brokerage firms): "I think it was a mistake in the statute, frankly, to talk about spoofing because I really don't know what spoofing is" and "I'm not sure [i]f the definition of spoofing can be agreed upon by the ten people around this table." CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) ("CFTC Roundtable") at 64 (Ex. C);

- Adam Nunes, Hudson River Trading Group (a prominent algorithmic trading firm): "[T]here's a fundamental question which is, if you're putting orders out that are taking risk, can you be defined as spoofing?" *Id.* at 111;

- Gregory Mocek, former CFTC Director of Enforcement on behalf of the Commodity Markets Council (a trade association for commodity futures exchanges and industry members): "I'm not quite sure I know what spoofing is." *Id.* at 171;

- Kenneth Raisler, former General Counsel of the CFTC on behalf of the Futures Industry Association ("FIA") (a global trade organization for futures, options and cleared swaps markets): "[It is h]ard to imagine how [spoofing] even applies to the futures world or how it should be applied." *Id.* at 176-77.[3]

To the extent that panelists or Commissioners even attempted to define "spoofing," they all did so in different ways. *See id.* at 21, 51, 81-82, 90-93, 97, 102-03, 104-05, 107-08, 213-14, 228-29.

Presciently, former CFTC Enforcement Director Mocek described the difficulty that the government would face in attempting to enforce the "anti-spoofing" provision in the face of a challenge to its vagueness:

> But the court isn't going to go through the process and say "Okay, wait a second here, is there a common understanding or meaning to the terms that—or in the statute?" And the answer is, after this morning's conversation—this conversation—is "no." The court's going to go through an analysis as "Is there a prior judicial construction?" And the answer is "no." The court's going to go through an analysis and say, "Is there a treatise out there? Are there terms commonly used in the industry to define these terms that are in the statute?" And the answer is "no." And then the final answer is a ruling that says that the statute is unconstitutionally vague.

*Id.* at 171-72 (punctuation added for readability).

In addition to the comments made at the CFTC Roundtable, the CFTC received written comments from industry members who consistently observed that "spoofing" was a vague term that had no accepted meaning in the futures markets. For example, the FIA expressed concern that Section 6c(a)(5) is "an overly vague provision that is not clearly defined

---

[3] Mr. Raisler is counsel to Mr. Coscia in this action. The Roundtable occurred nearly a year before the events at issue in this case, and Mr. Raisler had no relationship with Mr. Coscia at that time.

and prohibits activities that are also not subject to clear definition"; "is extremely vague and vulnerable to constitutional challenge by market participants"; and "[t]he term 'spoofing' is not one that has been commonly used in the futures and derivatives markets and there is no generally understood or accepted meaning of the term in this context."[4]    Letter from John M. Damgard, President of the FIA, at 1, 3, 6 (Dec. 23, 2010) (Ex. D).

Other industry members echoed the FIA's vagueness and fair notice concerns. *See* Letter from Gary DeWaal, Senior Managing Director of Newedge, at 1 (Jan. 5, 2011) (Ex. E)  ("[W]e believe that Section [6c(a)(5)] . . . is unconstitutionally vague."); *id.* at 3 ("Many different aspects of [Section 6c(a)(5)] are not 'clearly defined.'") (quoting *Grayned* v. *City of Rockford*, 408 U.S. 104, 108-09 (1972)); Letter from Stuart J. Kaswell, General Counsel of the Managed Funds Association, at 7 (Dec. 28, 2010) (Ex. F) ("The statutory definition is vague and does not offer market participants guidance about what behavior and activities are prohibited."); *id.* ("'[S]poofing' is not a term that has ever been commonly used in the futures and derivatives markets.  Securities markets have their own concept of 'spoofing,' but its application in the futures and derivatives markets is not at all clear.").

Two additional comments bear particular mention.  First, the CME Group—the very same exchange on which Mr. Coscia is alleged to have engaged in unlawful spoofing—noted that "[t]he statute's definition of 'spoofing' . . . is too broad and does not differentiate legitimate market conduct from manipulative conduct that should be prohibited." Letter from Craig S. Donohue, Chief Executive Officer of the CME Group, at 8 (Jan. 3, 2011) (Ex. G).  Second, one industry member ominously noted that the "lack of clarity is particularly

---

[4]    The FIA further explained that "[s]poofing in the securities markets is a form of price manipulation of the national best bid or offer" and "it is unclear how the practice can be defined adequately given the substantial differences between the securities markets and the futures and derivatives markets."  *Id.* at 6.

troubling since certain violations of Section [6c(a)(5)] could potentially result in criminal action." Letter from Gary DeWaal, *supra*, at 5 n.5 (Ex. E).

### C. CFTC's Proposed Interpretive Order

Given the confusion and concern expressed at the December 2010 roundtable and in ensuing commentary, the CFTC abandoned its rulemaking efforts and decided instead to take the more modest step of issuing "interpretive guidance." In February 2011, the CFTC held an open meeting to discuss the need for "an interpretive order regarding disruptive trading practices authority." CFTC Open Meeting on the Twelfth Series of Proposed Rulemakings Under the Dodd-Frank Act 5 (Feb. 24, 2011) ("Open Meeting") (Ex. H). At the meeting, the CFTC Commissioners themselves made clear that they had the same vagueness concerns about the disruptive trading provisions, including spoofing, that industry participants had advanced.

Commissioner Jill Sommers was explicit, stating, "When the draft language of [the provision] was first discussed among Commission staff, it was my view and the view of others [at the CFTC] that *the language was too vague*." *Id*. at 12 (emphasis added). Commissioner Sommers criticized the agency's decision to propose an interpretive order rather than issue rules, stating the "*[d]isruptive trading practices statutory language is vague* and *this proposed [order] does not cure that vagueness*. And in many areas the order raises more questions than it answers . . . ." *Id*. at 13 (emphasis added). She explained that, at the time the statutory provision was being drafted, there was "consensus in the [CFTC] around the view that if draft language was included in the final legislation, clarifying rules would be necessary and appropriate." *Id*. "That's also the message," she explained, that the CFTC had "received from the public in response to the ANPR and the roundtable." *Id*. She concluded by emphasizing the need "to provide the public and market participants with clear parameters distinguishing prohibited conduct from legitimate trading activity." *Id*. In the end, because she was not

satisfied that guidance—as opposed to rules—would provide market participants with sufficient clarity, Commissioner Sommers voted against issuing it.

But even those Commissioners who ultimately supported the proposed interpretive order agreed that the statutory language was vague. Commissioner Scott O'Malia acknowledged that "[t]he *admittedly vague* statutory prohibitions have presented some tough issues and we have spent long hours debating the appropriate course of action." *Id*. at 23 (emphasis added). Commissioner O'Malia further explained that the agency was "issuing a proposed interpretive order to provide guidance as to the type of trading, conduct and practices that will constitute violations." *Id*. Notably, however, Commissioner Sommers' concern that the proposed interpretive order failed sufficiently to "distinguish[] prohibited conduct from legitimate trading activity" appears to have been left unresolved, *id*. at 13, and all Commissioners appeared to contemplate further action. *See id*. at 5, 7, 13, 16, 24.

In March 2011, the CFTC terminated the ANPR, *see* 76 Fed. Reg. 14,826 (2011), and simultaneously issued its proposed interpretive order. *See id*. at 14,943. That proposed interpretive order was, of course, tentative, subject to revision, and not binding on either the CFTC or members of the public. *See* CFTC Q&A — Proposed Interpretive Order on Disruptive Trading Practices, available at http://www.cftc.gov/LawRegulation/DoddFrank Act/Rulemakings/DF_24_DisruptiveTrading/index.htm (last visited Dec. 14, 2014) (Ex. I) ("The Proposed Interpretive Order is a proposal — it does not bind the Commission or the public."). In the proposed order, the CFTC noted that market participants had consistently expressed concerns about vagueness and "requested additional clarity and refinement in the definition of terms such as . . . 'spoofing.'" 76 Fed. Reg. at 14,945. But instead of providing a workable definition, the CFTC merely recited the same statutory language that both industry and its Commissioners had criticized as vague—namely, that spoofing "requires that a person intend to cancel a bid or offer before execution." *Id*. at 14,947. Because that definition

admittedly sweeps in entirely legitimate market activity, the CFTC specified that the inquiry is a fact-specific one, depending on "the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." *Id.*

The proposed guidance identified three types of conduct that might amount to "spoofing": (1) "[s]ubmitting or cancelling bids or offers to overload the quotation system of a registered entity"; (2) "submitting or cancelling bids or offers to delay another person's execution of trades"; and (3) "submitting or cancelling multiple bids or offers to create an appearance of false market depth." *Id.* Critically, the proposed guidance did *not* offer as an example of "spoofing" the core of what Mr. Coscia is alleged to have done here: submitting multiple bids or orders in an effort to cause a material price movement. *See* Indictment ¶ 3 ("Coscia's strategy moved the market in a direction favorable to him . . . ."). The CFTC did not classify this sort of conduct as an example of spoofing until it issued its final interpretive guidance in May 2013—well after Mr. Coscia's alleged conduct.

### D. Public Commentary on the Proposed Interpretive Guidance

The proposed interpretive guidance generated continued criticism from market participants that it did not sufficiently cure the vagueness of the "spoofing" provision. The leading futures and securities industry trade groups reiterated that spoofing lacks any shared, industry-wide definition. The FIA and the Securities Industry and Financial Markets Association ("SIFMA") jointly noted that "'[s]poofing' is not a term that is commonly used and understood in the context of futures and derivatives markets," and, notwithstanding the proposed guidance, "this key term is *still impermissibly vague*," because "'spoofing' has been used to describe trading practices in the securities markets . . . [and] it is unclear how [the concept] would apply in the futures and derivatives markets, [which] operate on different assumptions and serve very different purposes." Letter from John M. Damgard, President of the FIA, and Kenneth E. Bentsen, Jr., Executive Vice President of SIFMA, at 6 (May 17, 2011)

(Ex. J) (emphasis added); *see also* Letter from Stuart J. Kaswell, General Counsel of the Managed Funds Association, at 5-6 (May 16, 2011) (Ex. K) (arguing that the proposed order did not "adequately clarify and define for market participants" the conduct that would qualify as spoofing).

E.    **CFTC's Interpretive Guidance and Policy Statement**

Although the deadline for comments on the proposed interpretive order passed in May 2011, it was two years before the CFTC issued its final interpretive guidance and policy statement. *See* 78 Fed. Reg. 31,890 (2013). All of the conduct at issue in the Indictment is alleged to have taken place during this interval when there was no binding guidance available that might have assisted market participants in attempting to distinguish legitimate trading from impermissible spoofing.

When finally issued in May 2013, the final interpretive guidance reiterated that the statutory definition of "spoofing"—*i.e.*, intent to cancel a bid or offer before execution—encompasses various types of entirely legitimate trading activity (like partial-fill orders and stop-loss orders). The order stated that "a spoofing violation will not occur when the person's intent when cancelling a bid or offer before execution was . . . as part of a legitimate, good-faith attempt to consummate a trade." *Id*. at 31,896. "When distinguishing between legitimate trading (such as trading involving partial executions) and 'spoofing,'" the CFTC explained that it would "evaluate the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." *Id*. In other words, the CFTC reserved for itself the ability to judge in hindsight what was, and what was not, unlawful spoofing.

As especially relevant here, the CFTC now listed "four non-exclusive examples of possible situations for when market participants are engaged in 'spoofing' behavior": (1) "[s]ubmitting or cancelling bids or offers to overload the quotation system of a registered

-13-

entity"; (2) "submitting or cancelling bids or offers to delay another person's execution of trades"; (3) "submitting or cancelling multiple bids or offers to create an appearance of false market depth"; and (4) "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards." *Id.* The first three examples were all taken verbatim from the CFTC's March 2011 non-binding, proposed interpretive order. The fourth example—"canceling bids or offers with intent to create artificial price movements"—was not in the earlier proposed order but appeared for the first time in the May 2013 policy statement. That was more than 18 months after Mr. Coscia's alleged trading ended.

## ARGUMENT

As a general rule, "[a]n indictment is reviewed on its face" and is only valid "if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States* v. *White*, 610 F.3d 956, 958 (7th Cir. 2010). Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, however, an indictment is properly subject to dismissal before trial if it is *legally* insufficient. Issues of law are thus properly reviewed on a motion to dismiss. *United States* v. *Yasak*, 884 F.2d 996, 1001 n.3 (7th Cir. 1989) ("A defense generally is capable of determination before trial if it involves questions of law rather than fact.").

As relevant here, an indictment must be dismissed if founded on an unconstitutionally vague statute. *See, e.g.*, *United States* v. *Vest*, 448 F. Supp. 2d 1002, 1015 (S.D. Ill. 2006) (sustaining a motion to dismiss on the grounds that the charged statute was unconstitutionally vague as applied). It must also be dismissed if—even taking the alleged facts as true—it fails to state a claim. *See United States* v. *Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) ("The district court . . . correctly dismissed the indictment, not because the government could not prove its case, but because there was no case to prove."). Both questions involve

-14-

exclusively legal inquiries and thus are proper subjects of pretrial resolution. *See United States v. Novak*, No. 13-CR-312, 2014 WL 2937062, at *2-3 (N.D. Ill. June 30, 2014) (reviewing an indictment for vagueness and failure to state a claim).

**I.      The Spoofing Charges Must Be Dismissed Because The "Anti-Spoofing" Provision Is Void for Vagueness.**

The "anti-spoofing" provision prohibits "engag[ing] in any trading, practice, or conduct" on an exchange that "is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5)(C). Basic principles of due process, however, do not permit a statute to sweep in a broad swath of conduct without a standard for separating the lawful from the unlawful. That is precisely what the "anti-spoofing" provision does: it prohibits a wide range of trading activity without offering any reasonably ascertainable standard for separating legitimate trading from illegitimate spoofing.

**A.      The "Anti-Spoofing" Provision Does Not Provide Fair Notice Of What Trading Activity Constitutes Spoofing.**

**1.      Governing Legal Standards**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). To satisfy the requirements of due process, a criminal statute must therefore include "ascertainable standards of guilt" such that people "of common intelligence [are not] required to guess at the meaning of the enactment." *Winters* v. *New York*, 333 U.S. 507, 515 (1948). The "standards of certainty" in statutes that provide for criminal punishment are even "higher than in those depending primarily upon civil sanction for enforcement." *Id*.

To pass constitutional muster, a statute may not be so broad that it sweeps in legitimate conduct yet fails to provide any standard for segregating the lawful from the unlawful. The Supreme Court has struck down statutes that fail this basic test. For example, in

*Chicago* v. *Morales*, 527 U.S. 41, 57 (1999), the Court struck down a municipal loitering

statute, reasoning that "[s]ince the city cannot conceivably have meant to criminalize each

instance a citizen stands in public with a gang member, the vagueness that dooms this

ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather

about what loitering is covered by the ordinance and what is not." Likewise, in *Smith* v.

*Goguen*, 415 U.S. 566, 573-74 (1974) (quotation marks omitted), the Court invalidated a

statute barring "treat[ing] contemptuously" the flag of the United States because "[t]he

statutory language . . . fails to draw reasonably clear lines between the kinds of nonceremonial

treatment [of the flag] that are criminal and those that are not."

In other words, "[t]he Constitution does not permit a legislature to 'set a net

large enough to catch all possible offenders, and leave it to the courts to step inside and say who

could be rightfully detained, and who should be set at large.'" *Morales*, 527 U.S. at 60 (quoting

*United States* v. *Reese*, 92 U.S. 214, 221 (1876)). The statute itself—either on its face or by

virtue of some administrative or real-world referent—must point toward a reasonably

ascertainable way of distinguishing permissible and impermissible conduct. *See, e.g.*, *United

States* v. *Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 36 (1963) (discussing a case in which the

operative statutory term lacked "a meaningful referent in business practice or usage"). Any

statute that lacks such a standard both "trap[s] the innocent by not providing fair warning" and

"impermissibly delegates basic policy matters to policemen, judges, and juries for resolution

on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory

application." *Grayned*, 408 U.S. at 108-09; *see also Ashton* v. *Kentucky*, 384 U.S. 195, 199

(1966) (invalidating "a statute sweeping in a great variety of conduct under a general and

indefinite characterization, and leaving to the executive and judicial branches too wide a

discretion in its application") (quotation marks omitted).

In some cases, of course, a statute will feature a definite core of legitimate application and will be vague only at the periphery. Statutes that fail to separate the permissible from the impermissible, however, "simply [have] no core." *Goguen*, 415 U.S. at 578. Laws of this ilk are "vague 'not in the sense that [they] require[] a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Morales*, 527 U.S. at 60 (quoting *Coates* v. *Cincinnati*, 402 U.S. 611, 614 (1971)). "This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause." *Goguen*, 415 U.S. at 578.

### 2. Discussion

The "anti-spoofing" provision suffers from exactly the problem the Supreme Court has identified: it prohibits a wide range of trading activity without offering a reasonably ascertainable standard for separating the permissible from the impermissible. Section 6c(a)(5)(C) defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution." That definition does not square with a common understanding of "spoofing," let alone an accepted meaning in the futures markets. Indeed, as the CFTC's rulemaking process made clear, there simply is no common understanding of spoofing in futures markets because the term has not previously been applied in such markets.

The conduct covered by the statutory definition includes many types of trading activity that the CFTC, various commodity exchanges, and market participants all agree are perfectly legitimate and indeed beneficial to the efficient functioning of futures markets. For example, as conceded by the CFTC and reflected in the commentary of industry members during the CFTC rulemaking process, traders frequently enter orders larger than necessary to ensure that they obtain a sufficient quantity (partial-fill orders), or orders that are programmed to execute only when the market reaches a certain price (stop-loss orders). No one has

questioned that such trades remain permissible, yet they all fall within the plain language of the "anti-spoofing" provision.

Mr. Coscia's alleged trading is indistinguishable from many forms of widely accepted, wholly permissible practices. The Indictment alleges that Mr. Coscia's algorithms were programmed to cancel his "quote orders" in two discrete situations: (1) the expiration of a preset durational limit, or (2) the occurrence of a change in market conditions, *i.e.*, the completion of a transaction at a price different from the price at which the last transaction in the market had been executed. *See* Indictment Count One ¶¶ 11-12. Any intent by Mr. Coscia to cancel his orders was therefore concededly conditional, and in this respect Mr. Coscia's trading was virtually identical to other durational or contingent orders routinely permitted by exchange trading interfaces.

No law, rule, or regulation requires that an order be displayed for any particular duration. To the contrary, electronic trading platforms in futures markets provide menus of order options that enable traders to specify the length of time or the conditions under which an order will remain active in the marketplace. For example, the primary trading platform used by Mr. Coscia, CME's Globex, permits "Good Til Date" orders, which "remain active on the order book until they are completely executed, expire at the specified date [or time], are canceled, or when the instrument expires." *See* CME Globex, Order Qualifiers, available at http://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Qualifiers (last visited Nov. 6, 2014) (Ex. M) (explaining each type of duration order supported by CME Globex). Globex also permits "Fill Or Kill Orders," which "must be fully filled immediately or the entire order is canceled." *Id.*[5] In view of the foregoing, the mere placement of a durational order, or an order that will cancel upon the occurrence of certain conditions, cannot qualify as

---

[5]    *See also* OneChicago Rulebook, Rule 404, available at http://www.onechicago.com/?page_id=2697 (last visited Nov. 6, 2014) (Ex. R) (listing permissible duration orders).

spoofing. And just like standard durational orders, Mr. Coscia's bids and offers were subject to a predetermined time limit and were available for acceptance as long as they remained in the market. The statutory intent-to-cancel standard therefore provides no basis for singling out his conduct.

That is why, from the beginning of the CFTC's rule-making process, all parties have recognized that the terms of Section 6c(a)(5)(C) fail to differentiate between permissible trading activity and impermissible "spoofing." At the CFTC Roundtable in December 2010, market participants repeatedly pointed out that the statutory definition of "spoofing" sweeps in commonplace market activity. For example:

- Rajiv Fernando, Chopper Trading, LLC (a well-known technology-based trading firm): "I could give a perfectly legitimate reason why I would put in an order with no intent to have it executed." CFTC Roundtable at 35 (Ex. C);

- Dean Payton, Deputy Chief Regulatory Officer, CME: "I may have an order that I put in that is only going to be executed under very specific circumstances and very specific market conditions. If those change . . . that order is going to be cancelled. There's nothing inherently problematic about that." *Id*. at 229-30.[6]

And as discussed above, the CFTC Commissioners themselves conceded that interpretive guidance—if not formal rulemaking—was necessary to put the public on notice as to precisely what the statute prohibits. The CFTC therefore made clear that the statutory definition of

---

[6]    Interested parties continued to reiterate these concerns throughout the administrative process. Comment letters submitted in reaction to the CFTC's proposed interpretive order, for example, are rife with such warnings. *See, e.g.*, Letter from Craig S. Donohue, Chief Executive Officer of the CME Group, at 2 (May 17, 2011) (Ex. Q) (highlighting the danger that "legitimate trading practices will be arbitrarily construed, post-hoc, to be unlawful"); *id*. at 7 (referring to "the legitimate cancellation of other unfilled or partially filled orders"); Letter from Stuart J. Kaswell, General Counsel of the Managed Funds Association, at 5 (May 16, 2011) (Ex. K) ("[A]t times traders enter larger than necessary orders with the intention to cancel part of the order. This practice is a legitimate trading strategy that helps ensure the trader's order is filled, but it could constitute proscribed conduct."); Letter from John M. Damgard, President of the Futures Industry Association, and Kenneth E. Bentsen, Jr., Executive Vice President of SIFMA, at 6 (May 17, 2011) (Ex. J) ("Traders engage in legitimate trading practices that are unintentionally captured by Section 747's definition of 'spoofing.'").

spoofing should not be read literally. *See* 78 Fed. Reg. 31,890, 31,896 (exempting partial-fill and stop-loss orders); *see also* 76 Fed. Reg. 14,943, 14,947.

The inadequacy of the "intent to cancel" standard is further illustrated by the fact that, according to some estimates, the vast majority of orders placed by high-frequency traders are cancelled prior to execution. According to then-Chairman of the CFTC Gary Gensler, "[a]n estimated 80 to 90 orders are put into futures markets for every trade that actually happens." Scott Patterson, *CFTC Targets Rapid Trades,* Wall Street Journal, March 15, 2012, http://www.wsj.com/articles/SB10001424052702303863404577283850694110794 (Ex. P). And as the then-Chairwoman of the SEC similarly stated in the analogous context of high-frequency securities trading, "We know that, in the ordinary course, many high frequency trading firms cancel 90 percent or more of the orders they submit to the markets." Mary L. Schapiro, Chairwoman of the SEC, Address at the Economic Club of New York: Strengthening Our Market Equity Structure (Sept. 7, 2010) (transcript available at http://www.sec.gov/news/speech/2010/spch090710mls.htm) (Ex. L). Permitting governmental agencies and prosecutors to select, without statutory guidance, which of these canceled orders to treat as crimes "delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108-09.

The "anti-spoofing" provision is merely the latest example of provisions of the CEA which courts have found too vague to be enforced in the face of due process challenges. In *United States* v. *La Mantia*, 2 Comm. Fut. L. Rep. (CCH) ¶ 20,667 (N.D. Ill. Aug. 9, 1978), for example, a court in this district sustained a vagueness challenge to criminal charges alleging violations of a provision of the CEA that proscribed "fictitious sale[s]." In finding the provision void for vagueness, the court concluded that the term had no "commonly understood meaning," was "not a term in legal currency," and that "resort to the dictionary len[t] no clarity." The court then sought to determine if there was a referent in the "trade calling or

profession to which the statute applies," but concluded there was none because "treatises on commodities trading [did] not use the term." Finally, the court found no prior judicial construction of the term and determined that "the statutory language suffers from indefinable vagueness to the end that an indictment may not constitutionally be predicated upon it." *Id.*

The same conclusion reached in *La Mantia* applies here. "Spoofing" has no commonly understood meaning. It is not used in the "trade or calling," *i.e.,* the futures industry. The provision has never been the subject of judicial construction or interpretation. And its dictionary definition—"deceive, hoax"— sheds no useful light on its meaning. *See* Merriam-Webster Online, "Spoof," http://www.merriam-webster.com/dictionary/spoof (last visited Dec. 7, 2014). Consequently, the "anti-spoofing" provision suffers from the very same "indefinable vagueness" as the "fictitious sales" provision, and an indictment may not be constitutionally predicated upon it.

Courts have similarly sustained as-applied challenges to other provisions of the CEA. In *Stoller* v. *CFTC*, 834 F.2d 262 (2d Cir. 1987), for example, the Second Circuit reversed a CFTC civil administrative determination that a defendant had violated the "wash sales" provision of the CEA by engaging in "roll forward" trading. The court reasoned that (1) "wash sale" was not defined in the CEA, (2) the CFTC's predecessor agency had never published its interpretation that "roll forward" trades were "wash sales" in a manner "sufficient to apprise the public at large," (3) such trading had been "commonplace" and "unenforced for years," and (4) the agency had suggested that some forms of "roll forward" trading "might be permissible." *Id.* at 265-66. Under these circumstances, the court concluded that the defendant lacked "appropriate notice" that his trading amounted to "wash sales" and enforcement of the provision against him could not stand. *Id.* at 267. So too here, where Mr. Coscia and other market participants lacked sufficient notice that trading of the nature alleged here could amount to unlawful "spoofing."

Similarly, in *United States* v. *Radley*, 659 F. Supp. 2d 803, 812-16 (S.D. Tex. 2009), *aff'd on other grounds*, 632 F.3d 177 (5th Cir. 2011), the court dismissed criminal violations of the CEA's anti-manipulation provision on the ground that "manipulation" was vague as applied to the defendants' conduct. In particular, the court concluded that the defendants were not on notice that their activity created "artificial prices," *i.e.*, prices which did "not reflect basic forces of supply and demand," because they engaged in no misrepresentations to other counterparties, and their trading involved legitimate bids or offers as to which the defendants were willing and able to execute. *Id.* (quotation marks omitted).

The clear lesson of *La Mantia*, *Stoller*, and *Radley* is that when Congress has failed in its efforts to draft provisions of the CEA that give fair notice to market participants about the confines of lawful and unlawful activity, enforcement actions based on these provisions cannot proceed consistent with constitutional guarantees. That lesson applies here in spades: the criminal charges in the Indictment predicated on the "anti-spoofing" provision fail to comport with basic guarantees of due process.

> **B. CFTC's Subsequent Interpretive Guidance Does Not Cure The Vagueness As Applied To Mr. Coscia's Trading Activity.**

For the reasons set forth above, the text of the "anti-spoofing" provision does not itself contain any limiting principle and thus could not have provided the requisite notice to Mr. Coscia that his conduct might be subject to its prohibition. Nor did the CFTC's subsequent interpretive guidance clarify the statute in a timely and adequate way that applied to Mr. Coscia's trading.[7]

_____

[7] The CME itself did not publish an anti-spoofing rule until August 2014, a full three years after Mr. Coscia's conduct. That rule largely tracks the terms of the statute but—again illustrating the vagueness of the statutory definition—the CME enumerated a number of activities ostensibly covered by the rule that are nonetheless deemed legitimate. *See* CME Group RA 1405-5, at 5 (Aug. 28, 2014) (Ex. N) ("Market participants may enter stop orders as a means of minimizing potential losses with the hope that the order will not be triggered. . . . Such an order entry is not prohibited by this Rule."); *id.* ("It is understood that market participants may want to achieve queue position at certain price levels and, given changing market conditions, may wish to modify or cancel those orders. In the absence of other

It is settled law that an administrative interpretation can clarify an otherwise vague statute only with respect to conduct that occurs after the interpretation is issued. An agency's "order cannot retroactively give adequate warning of the boundary between the permissible and impermissible applications of the law." *Morales*, 527 U.S. at 59. The relevant inquiry is thus "whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." *United States* v. *Lanier*, 520 U.S. 259, 267 (1997) (emphasis added). If a statute does not provide adequate notice at the time of the defendant's conduct, an agency's after-the-fact clarification does nothing to cure the lack of fair warning as to what the law prohibited. *See, e.g.*, *Lanzetta* v. *New Jersey*, 306 U.S. 451, 456 (1939) ("Appellants were convicted before the opinion in *State* v. *Gaynor*. It would be hard to hold that, in advance of judicial utterance upon the subject, they were bound to understand the challenged provision according to the language later used by the court."). As explained below, at the time of Mr. Coscia's conduct, the state of the CFTC's pronouncements suggested, if anything, that his trading was *not* spoofing.

> **1. At The Time Of Mr. Coscia's Trading Activity, The Commission Had Issued Only A Nonbinding Proposed Order That Did Not Even Purport To Cover His Conduct.**

In November 2010, approximately four months after passage of the Dodd-Frank Act, the CFTC's ANPR invited commentary on how to distinguish "spoofing" from "legitimate trading activity." 75 Fed. Reg. at 67,302. The ANPR questioned whether "[s]ubmitting or cancelling multiple bids or offers to cause a material price movement" should "be considered a form of 'spoofing' that is prohibited by paragraph (C)" or instead should be "*separately specif[ied] and prohibit[ed] . . . as distinct from 'spoofing'*" under the CFTC's residual enforcement authority. *Id.* (emphasis added); *see* 7 U.S.C. § 6c(a)(6) (providing the

---

indicia that the orders were entered for disruptive purposes, they would not constitute a violation of Rule 575.").

CFTC with residual authority to regulate "any other trading practice that is disruptive of fair and equitable trading").

The CFTC's request for commentary illustrates the crucial point that the status of Mr. Coscia's alleged conduct was an open question from the outset. Indeed, the request reveals a double layer of vagueness: whether the conduct at issue here could be considered a disruptive trading practice at all; and, if so, whether it could specifically be classified as "spoofing" (rather than proscribed under the CFTC's residual authority). The government's contention—namely, that Mr. Coscia should have understood his conduct to be prohibited at a time when the CFTC itself lacked a grasp of the statute's scope—defies logic.

In March 2011, the CFTC terminated the ANPR and issued its proposed interpretive order. *See* 76 Fed. Reg. 14,826; *id*. at 14,943. The proposed order was binding neither on market participants nor on the CFTC. *See CFTC* v. *Schor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."); *Am. Med. Ass'n* v. *United States*, 887 F.2d 760, 769 (7th Cir. 1989) ("[A]n agency's proposed rule is merely that, a proposal.").

Even if the proposed guidance had been binding, however, it still would not have covered Mr. Coscia's conduct. As discussed above, although the proposed order invited commentary on three types of conduct that might constitute "spoofing," it did *not* offer as a possible example of "spoofing" the other practice that had previously been identified in the ANPR: bidding or offering to cause price movements. Thus, so far as any market participant could discern, as of March 2011, the CFTC had *abandoned* consideration of whether bidding or offering to cause price movements should be treated as "spoofing." Yet this is precisely the core of the conduct with which Mr. Coscia is charged. *See, e.g.*, Indictment Count One ¶ 3 ("Coscia's strategy moved the market in a direction favorable to him, enabling him to purchase

contracts at prices lower than, or sell contracts at prices higher than, the prices available in the market before he entered and canceled his large-volume orders.").

Although a supposed effort to move the market is the core of the conduct alleged, the Indictment also charges that Mr. Coscia engaged in conduct arguably similar to the third example of "spoofing" in the proposed order: "submitting or cancelling multiple bids or offers to create an appearance of false market depth." 76 Fed. Reg. at 14,947; *see* Indictment Count One ¶ 3 ("Coscia devised this strategy to create a false impression regarding the number of contracts available in the market. . . ."). But even the inclusion of this example in the proposed guidance did not provide Mr. Coscia with requisite notice, because at the time of his conduct, the proposed order was a nonbinding request for public commentary—not a final, enforceable order that would qualify as a valid and settled referent for traders seeking guidance as to confines of lawful activity. Accordingly, the proposed order did not provide Mr. Coscia with adequate notice sufficient to satisfy constitutional guarantees.[8]

### 2. The Commission's Final Guidance Postdates Mr. Coscia's Trading Activity And In Any Event Does Not Cover His Conduct.

In May 2013, long after all the events at issue in the Indictment, the CFTC issued its final interpretive guidance and policy statement. Because the guidance was issued after the charged conduct, it obviously cannot cure the vagueness problems described above. *See Morales*, 527 U.S. at 59. But even as a substantive matter, the final guidance appears not even to cover Mr. Coscia's trading.

The final guidance begins by conceding the obvious point that "spoofing" does not mean all "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C). Instead, the inquiry will be highly fact-intensive: "[w]hen

---

[8]    The Indictment alleges nothing to support a claim that any of Mr. Coscia's orders reflected "false" market depth. As noted, the Indictment concedes that all of these orders were available to be filled, and does not allege that Mr. Coscia ever failed to honor them if other market participants acted upon them. *See* Indictment Count One ¶ 11.

distinguishing between legitimate trading (such as trading involving partial executions) and 'spoofing,'" the CFTC explained that it would "evaluate the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." 78 Fed. Reg. at 31,896.

The final guidance also provided "four non-exclusive examples of possible situations for when market participants are engaged in 'spoofing' behavior." *Id*. The first three examples were all drawn from the CFTC's proposed interpretive order. The fourth example—"canceling bids or offers with intent to create artificial price movements upwards or downwards"—was not in the earlier proposed order. Thus, at least until May 2013, no one—including Mr. Coscia—had reasonable notice that this sort of conduct might later be thought to violate the "anti-spoofing" provision.[9] Under these circumstances, the charges against Mr. Coscia based on "spoofing" cannot stand and should be dismissed.

## II.     The Commodity Fraud Counts Are Legally Invalid.

Resting on the very same allegations that underlie the flawed spoofing charges, the Indictment also alleges six counts of commodity fraud. But as we explain below, these novel charges also fail as a matter of law for three reasons.

*First*, the government cannot simply change labels to make criminal what the Dodd-Frank Act did not clearly prohibit. Because Mr. Coscia's conduct is not prosecutable under the "anti-spoofing" provision, simply alleging it to be a "fraud" does not suffice. Indeed, the government tried this very same tactic in *Radley*, only to have both the district court and the court of appeals reject it.

---

[9]     Although beyond the necessary scope of this motion, Mr. Coscia does not concede that his conduct fell within the ambit of this fourth example, because there is no reason to believe it created "*artificial* price movements upwards or downwards." 78 Fed. Reg. at 31,896 (emphasis added). Artificiality is a concept drawn from manipulation cases under the CEA, and it requires that prices be "determined by forces other than supply and demand." *Frey* v. *CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991).

*Second*, the conduct alleged in the Indictment cannot support a fraud charge as a matter of law. Mr. Coscia placed bids and offers at given quantities and prices and for specific durations. In these open-market, arm's-length transactions, he made no affirmative or implied misrepresentations to other market participants, and he breached no duty that would make any omission actionable as fraud.

*Third*, if the commodities fraud statute—which, notably, has never been the subject of *any* reported judicial decision—were construed to reach Mr. Coscia's trading behavior, it too would be impermissibly vague.

### A. The Spoofing Charges Cannot Simply Be Relabeled As Fraud Charges.

Section 1348 of Title 18, United States Code, makes it a felony to:

[K]nowingly execute[], or attempt[] to execute, a scheme or artifice—

>(1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery . . . ; or
>(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, . . . .

The Indictment alleges the very same course of conduct as a basis for both the spoofing and commodity fraud charges. Stated differently, "spoofing" *is* the fraudulent scheme alleged. That attempt to re-characterize spoofing as fraud carries a clear consequence: once the spoofing charges fail for vagueness, the fraud charges must also be dismissed. *United States* v. *Radley*, 632 F.3d 177, 185 (5th Cir. 2011) ("Without an antecedent scheme to defraud, the wire fraud charges cannot survive.").

In *Radley*, the Fifth Circuit considered a virtually identical effort to transform an otherwise invalid CEA charge into a fraud charge. There, the government charged defendants with violations of the anti-manipulation and anti-cornering provisions of the CEA in connection with an alleged scheme to manipulate prices in the propane market. The district

court dismissed the CEA charges on the ground that the conduct fell within a specific statutory exemption from regulation for certain over-the-counter transactions, 7 U.S.C. § 2(g), and proceeded to rule that this same conduct could not properly be charged as wire fraud. On appeal, the Fifth Circuit affirmed, reasoning:

> The indictment here re-alleges as the "scheme to defraud" the same conduct and transactions that we have already found exempt from regulation under § 2(g). . . . Thus, when the government's allegations charge market manipulation and cornering as the "scheme to defraud," and our preceding discussion explains why this is not criminal conduct when falling within the § 2(g) exemption for OTC propane trades, the same scheme cannot alone be re-characterized and rendered illegal as wire fraud.

632 F.3d at 185.

The government's tactic is exactly the same here. As in *Radley*, "the only grounds the government allege[s] for a scheme to defraud are precisely those actions" that do not satisfy the "anti-spoofing" provision of the CEA. *Id*. The prosecution cannot remedy its failure under a more specific provision (spoofing) by relying on the more general (commodities fraud). Accordingly, the rationale of *Radley* requires that the inadequacy of the Indictment's spoofing charges compels the dismissal of the entirely derivative commodity fraud charges as well.

**B.     Mr. Coscia Did Not Engage In A Scheme To Defraud As A Matter of Law.**

Even setting aside the entirely dependent nature of its commodity fraud charges, the Indictment still does not allege a legally cognizable scheme to defraud. The defining characteristic of a scheme to defraud is that it is "designed to *deceive*." *United States* v. *LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) (interpreting bank fraud statute, 18 U.S.C. § 1344) (emphasis added). As a result, "[a] necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams* v. *Aztar Ind. Gaming Corp*., 351 F.3d 294, 299 (7th Cir. 2003) (citing *Neder* v.

*United States*, 527 U.S. 1, 25 (1999)). Without some element of deception, a defendant's conduct simply cannot be deemed a fraud because the government chooses to label it as one.

As a matter of law, Mr. Coscia's trading does not meet these basic requirements of fraud pleadings. Although the Indictment includes a conclusory assertion that Mr. Coscia "did misrepresent, conceal, and hide . . . the true acts and the purposes of the acts done in furtherance of the [spoofing] scheme," Indictment Count One ¶ 14, it does not allege that Mr. Coscia communicated *anything*—true or false—to other market participants. Nor does the Indictment suggest any sort of implied misrepresentation by Mr. Coscia that his orders would remain available for any particular duration. To the contrary, Mr. Coscia is simply alleged to have entered on an electronic trading platform bids and offers at given quantities and prices and for specific durations. Other market participants (whom Mr. Coscia did not know and with whom he never communicated) were free either to accept or reject them. This is not the stuff of fraud. *See Williams* v. *United States*, 458 U.S. 279, 284 (1982) ("Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a 'false statement,' for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'").

Nor does the Indictment allege that Mr. Coscia made any omission that could form the basis of a legally valid fraud charge. The "mere failure to disclose, absent something more"—such as the breach of a duty to disclose or "active or elaborate concealment"—does not suffice to demonstrate the existence of a scheme or artifice to defraud. *See Reynolds* v. *East Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989). There is no "something more" in this case: The Indictment does not allege that Mr. Coscia breached a duty to disclose or engaged in active concealment. He placed bids and offers through an automated trading system like a slew of other traders. His conduct occurred in the open and at arm's length from other market

participants. As a non-fiduciary, he had no duties of disclosure to others that would make some omission on his part actionable as fraud. *Compare United States* v. *Dial*, 757 F.2d 163, 168 (7th Cir. 1985) (affirming broker's fraud conviction for front-running customer trades, noting "[t]he essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market.").

To be sure, the Second Circuit said in *United States* v. *Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012), that the government need not show "false representations or material omissions" in order to sustain a conviction under § 1348. As an initial matter, however, that is not the law of this Circuit. The Seventh Circuit has made clear that "[a] necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams*, 351 F.3d at 299 (citing *Neder*, 527 U.S. at 25). In any event, the Second Circuit has recognized that some form of deceptive communication "is the template of virtually every case" brought under Section 1348 or its analogues under the federal securities laws. *See United States* v. *Finnerty*, 533 F.3d 143, 149 (2d Cir. 2008) (addressing Securities Exchange Act Rule 10b-5). Accordingly, even if a false representation or material omission is not categorically required, a defendant must have engaged in some form of deception for a fraud claim to be legally valid. The Indictment charges nothing of the sort.

Instead, the Indictment asserts in conclusory terms that Mr. Coscia's trading "fraudulently represented the state of the market." Indictment Counts 1-6. But saying that does not make it so. Missing from the Indictment is any coherent theory based in fact for *how* Mr. Coscia misled other market participants. The Indictment concedes that his bids and offers were available for execution during the time that they remained open; and, when accepted, they resulted in executed transactions. Indeed, in *Radley*, the court confronted and rejected very similar allegations. There, the court concluded that the indictment "[did] not allege a single lie or misrepresentation," and rejected the idea that the placing of "stacked bids" was somehow

-30-

misleading to market participants. "Other counterparties may have assumed that the 'stacked bids' came from multiple parties, but defendants did not perpetuate or cause this misconception. Since defendants were willing and able to follow through on all of the bids, they were not misleading." 659 F. Supp.2d at 815 (footnote omitted); *see* CFTC Roundtable at 107 (Ex. C) (John Lothian: "So, if it's an actionable order, it's an actionable order, it's part of the price discovery process, even if it's part of somebody's strategy or game or whatever, it's a bona fide order within the market."). Simply put, nothing about Mr. Coscia's conduct was fraudulent—a problem the government cannot remedy through pejorative labels. *See Radley*, 659 F. Supp. 2d at 816 ("Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA.").

The Second Circuit's decision in *Finnerty* is instructive on this point. There, a New York Stock Exchange floor broker was charged with securities fraud by engaging in "interpositioning," *i.e.*, instead of pairing off matching customers' bids and offers as NYSE rules required, the defendant "interposed" his own trading book in the middle of the transactions, earning unnecessary bid/ask spreads on each leg of the transactions. *See* 533 F.3d at 147 & n.2. The court observed that although the concept of deception embodied in Rule 10b-5 is "broad," "[t]he government has identified no way in which Finnerty communicated anything to his customers, let alone anything false." *Id*. at 148-49. It rejected the argument that some customers may have been misled by an implicit assumption that defendant would comply with stock exchange rules; "unless their understanding was based on a statement or conduct by Finnerty," he could not be held liable. *Id*. at 150.

The Second Circuit ultimately declined in *Finnerty* to impose liability because the government had, at bottom, failed to charge any act of deception: "no material misrepresentation, no omission, no breach of a duty to disclose, and no creation of a false

appearance of fact by any means." *Id.* at 151. In terms that apply equally to this case, the court concluded that "characterizing Finnerty's conduct as 'self-evidently deceptive' is conclusory; there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct." *Id.* at 150. Here, as in *Finnerty*, the government has alleged fraud in conclusory terms without identifying any deceptive acts whatsoever. And here, as in *Finnerty*, Mr. Coscia's conduct falls beyond the ambit of the charged statute, and dismissal is therefore warranted.

**C.      Section 1348 Would Be Impermissibly Vague If It Were Interpreted To Reach Mr. Coscia's Trading.**

If Section 1348 were construed to apply in this case, it would be void for vagueness as applied to Mr. Coscia's conduct. Neither the statute itself nor relevant case law provided Mr. Coscia with fair warning that his behavior might subject him to criminal liability. There is not a single reported judicial decision applying 18 U.S.C. § 1348 in connection with commodity futures trading, and Mr. Coscia violated none of the established rules of conduct that typically provide the basis for a fraud charge.[10] He made no misrepresentation or material omission, breached no duty to disclose, and engaged in no concealment. The "anti-spoofing" provision failed to supply the relevant standard of conduct for the simple reason that it failed to specify any standard at all. In sum, no source of authority put Mr. Coscia on notice at the time of his trading that it might be considered a form of fraud. The Due Process Clause therefore precludes sweeping that behavior within the purview of Section 1348.

*              *              *

---

[10]      Apart from this case, the commodities-fraud component of Section 1348 has been charged only three times. Each of the cases involved a Ponzi scheme in which the defendant made affirmative misstatements of fact to his victims. None featured conduct even remotely resembling the trading activities at issue here, thus further illustrating the novelty of the current prosecution.

The Dodd-Frank Act was an 800-page piece of legislation new to the futures industry. Its passage led to a virtually unprecedented raft of administrative action. As CFTC Commissioner O'Malia said at the open meeting in February 2011, "the Commission [has] put out 40 various proposals since August [2010] totaling over 975 pages in the Federal Register [in] those 9-point fonts everybody enjoys reading. If you lay those pages end to end lengthwise, it would stretch over 892 feet. That's more than the height of the Statute [sic] of Liberty tip to torch and the Washington Monument balanced on top." Open Meeting 19 (Ex. H).

The "anti-spoofing" provision was widely acknowledged—including by the CFTC Commissioners, the senior government officials primarily responsible for its enforcement—to be so vague and overly broad as to not give industry participants fair notice of what was and was not prohibited conduct. The CFTC therefore undertook to clarify the scope of "spoofing," which lacks any commonly accepted definition in futures markets.

Remarkably, prosecutors now contend that, in the midst of the CFTC's own debate about how to define "spoofing," Mr. Coscia criminally violated the "anti-spoofing" provision when he used an automated trading system for fewer than three months during 2011. It then attempts to shoehorn its spoofing accusations into the commodities fraud statute by re-labeling them as fraud. In these circumstances, requiring Mr. Coscia to face criminal prosecution and be subject to trial, possible felony conviction, and possible incarceration would result in precisely the fundamental unfairness against which the Due Process Clause guards.

-33-

**CONCLUSION**

For the foregoing reasons, the government's entirely novel spoofing and commodity fraud charges are both unconstitutional and substantively without merit as a matter of law. The Indictment should therefore be dismissed.

Respectfully submitted,

s/Steven R. Peikin
Steven R. Peikin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Of Counsel*:

Kenneth M. Raisler

- and –

Jeffrey B. Wall
Austin L. Raynor
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, District of Columbia 20006
(202) 956-7500

*Attorneys for Defendant Michael Coscia*

December 15, 2014